**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| DAWN M. WINGATE, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| *versus* | § | CIVIL ACTION NO. H-08-1966 |
| | § | |
| MICHAEL J. ASTRUE, Commissioner | § | |
| of the Social Security Administration, | § | |
| | § | |
| *Defendant.* | § | |

**MEMORANDUM AND ORDER**

Pending before the Court are Plaintiff Dawn M. Wingate's (" Wingate") motion for summary judgment and Defendant Michael J. Astrue's, Commissioner of the Social Security Administration (" Commissioner"), response to her motion for summary judgement. Wingate appeals the determination of an Administrative Law Judge (" the ALJ") that she is not entitled to receive Title II Social Security disability insurance benefits. *See* 42 U.S.C. §§ 416(I), 423. Having reviewed the pending motion, the submissions of the parties, the pleadings, the administrative record, and the applicable law, this Court is of the opinion that Wingate's Motion for Summary Judgment (Docket Entry No. 13) should be granted, and the Commissioner's decision denying benefits should be reversed and remanded, pursuant to " sentence four" of the Social Security Act, 42 U.S.C. § 405(g).

**I.      *Background***

On March 7, 2005, Wingate filed an application to receive disability insurance benefits with the Social Security Administration (" SSA") claiming that she has been disabled and unable

to work since March 29, 2004.  (R. 48-62).  Wingate alleges that she suffers from thoracic[1] and lumbosacral[2] neuritis[3] and radiculitis,[4] rheumatoid arthritis, fibromyalgia,[5] Crohn's disease,[6] lumbar disc displacement, and lumbosacral spondylosis.[7]  (R. 53).

After being denied benefits initially and on reconsideration, Wingate requested, and was granted, an administrative hearing before an ALJ to review the decision.  (R. 27, 28-34, 37-41).  A hearing was held on June 11, 2007, in Houston, Texas, at which the ALJ heard testimony from Wingate,  John C. Anigbogu, M.D. ("Dr. Anigbogu"), a medical expert ("ME"), Steven Goldstein, M.D. ("Dr. Goldstein"), a second ME, and Wallace A. Stanfill, a vocational expert ("VE").  (R. 18, 632-688).   In a decision dated July 20, 2007, the ALJ denied Wingate's application for benefits.  (R. 18-24).  On July 25, 2007, Wingate appealed the decision to the Appeals Council of the SSA's Office of Hearings and Appeals, which, on May 8, 2008, declined to review the ALJ's determination.  (R. 5-7, 12).  This rendered the ALJ's opinion the final decision

---

[1]  "Thoracic" is pertaining to or affecting the chest.  *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1834 (29th ed. 2000).

[2]  "Lumbosacral" is pertaining to the loins and sacrum (*i.e.*, the triangular bone just below the lumbar vertebrae).  *See* DORLAND'S, *supra*, at 1029, 1593.

[3]  "Neuritis" is an inflammation of a nerve, with pain and tenderness, anesthesia and parethesias, paralysis, wasting, and disappearance of the reflexes.  *See* DORLAND'S, *supra*, at 1207.

[4]  "Radiculitis" is inflammation of the root of a spinal nerve, especially of that portion of the root which lies between the spinal cord and the intervertebral column.  *See* DORLAND'S, *supra*, at 1511.

[5]  "Fibromyalgia" is pain and stiffness in the muscles and joints that is either diffuse or has multiple trigger points.  *See* DORLAND'S, *supra*, at 673.

[6]  "Crohn's disease" refers to a chronic granulomatous inflammatory disease of unknown etiology, involving any part of the gastrointestinal tract from mouth to anus, but commonly involving the terminal ileum with scarring and thickening of the bowel wall.  *See* DORLAND'S, *supra*, at 514.

[7]  "Spondylosis" is dissolution (ending) of a vertebra.  *See* DORLAND'S, *supra*, at 1684.

of the Commissioner.  *See Sims v. Apfel*, 530 U.S. 103, 107 (2000).  Wingate filed her original complaint in this case on June 17, 2008, seeking judicial review of the Commissioner's denial of her claims for benefits.  *See* Docket Entry No. 1.

**II.**   *Analysis*

    **A.**   *Statutory Bases for Benefits*

Social security disability insurance benefits are authorized by Title II of the Act and are funded by social security taxes.  *See also* SOCIAL SECURITY ADMINISTRATION, SOCIAL SECURITY HANDBOOK, § 2100.  The disability insurance program provides income to individuals who are forced into involuntary, premature retirement, provided they are both *insured* and *disabled*, regardless of indigence.  A claimant for disability insurance can collect benefits for up to twelve months of disability prior to the filing of an application.  *See* 20 C.F.R. §§ 404.131, 404.315; *Ortego v. Weinberger*, 516 F. 2d 1005, 1007 n.1 (5th Cir. 1975); *see also Perkins v. Chater*, 107 F.3d 1290, 1295 (7th Cir. 1997).  For purposes of Title II disability benefits, Wingate has acquired sufficient quarters of coverage to remain insured through December 31, 2009.  (R. 18). Consequently, to be eligible for disability benefits, Wingate must prove that she was disabled prior to that date.

Applicants seeking benefits under Title II must prove " disability" within the meaning of the Act, which defines disability as the " inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  *See* 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a)

### B.    *Standard of Review*

#### 1.    *Summary Judgment*

The court may grant summary judgment under FED. R. CIV. P. 56(c) when the moving party is entitled to judgment as a matter of law because there is no genuine issue as to any material fact.  The burden of proof, however, rests with the movant to show that there is no evidence to support the nonmoving party's case.  If a reasonable jury could return a verdict for the nonmoving party, then a motion for summary judgment cannot be granted because there exists a genuine issue of fact.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

An issue of fact is "material" only if its resolution could affect the outcome of the case. *See Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 189 (5th Cir. 1991).  When deciding whether to grant a motion for summary judgment, the court shall draw all justifiable inferences in favor of the nonmoving party, and deny the motion if there is some evidence to support the nonmoving party's position.  *See McAllister v. Resolution Trust Corp.*, 201 F.3d 570, 574 (5th Cir. 2000). If there are no issues of material fact, the court shall review any questions of law *de novo*.  *See Merritt-Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir. 1999).  Once the movant properly supports the motion, the burden shifts to the nonmoving party, who must present specific and supported material facts, of significant probative value, to preclude summary judgment.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *International Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Compania Mexicana de Aviacion, S.A. de C.V.*, 199 F.3d 796, 798 (5th Cir. 2000).

2.    *Administrative Determination*

Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision is supported by substantial evidence on the record as a whole and whether the proper legal standards were applied to evaluate the evidence. *See Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002). "Substantial evidence" means that the evidence must be enough to allow a reasonable mind to support the Commissioner's decision; it must be more than a mere scintilla and less than a preponderance. *See Richardson v. Perales*, 402 U.S. 389, 401 91971); *Masterson*, 309 F.3d at 272; *Brown*, 192 F.3d at 496.

When applying the substantial evidence standard on review, the court "scrutinize[s] the record to determine whether such evidence is present." *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001) (citations omitted). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. *See Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002). Alternatively, a finding of no substantial evidence is appropriate if no credible evidentiary choices or medical findings support the decision. *See Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). The court may not, however, reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner. *See Masterson*, 309 F.3d at 272. In short, "[c]onflicts in the evidence are for the Commissioner and not the courts to resolve." *Masterson*, 309 F.3d at 272.

C.    *ALJ's Determination*

An ALJ must engage in a five-step sequential inquiry to determine whether the claimant is, in fact, disabled:

1.    An individual who is working and engaging in "substantial gainful activity" will not be found disabled regardless of the medical findings.  *See* 20 C.F.R. § 404.1520(b).

2.    An individual who does not have a "severe impairment" will not be found to be disabled.  *See* 20 C.F.R. § 404.1520(c).

3.    An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.  *See* 20 C.F.R. § 404.1520(d).

4.    If an individual is capable of performing the work she has done in the past, a finding of "not disabled" must be made.  *See* 20 C.F.R. § 404.1520(f).

5.    If an individual's impairment precludes performance of her past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed.  *See* 20 C.F.R. § 404.1520(f).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *accord Boyd v. Apfel*, 239 F.3d 698, 704-05 (5th Cir. 2001).  The claimant has the burden to prove disability under the first four steps.  *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001).  If the claimant successfully carries this burden, the burden shifts to the Commissioner in step five to show that other substantial gainful employment is available in the national economy, which the claimant is capable of performing.  *See Masterson*, 309 F.3d at 272; *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).  If the Commissioner is able to verify that other work exists in significant numbers in the national economy that the claimant can perform in spite of her existing impairments, the burden shifts back to the claimant to prove that she cannot, in fact, perform the alternate work suggested.  *See Boyd*, 239 F.3d at 705.  A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis.  *See id*.

The mere presence of an impairment does not necessarily establish a disability. *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992).  An individual claiming disability benefits under the Act has the burden to prove that she suffers from a disability as defined by the Act.  *See Newton*, 209 F.3d at 452; *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990); *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985).  A claimant is deemed disabled under the Act only if she demonstrates an " inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  *Shave v. Apfel*, 238 F.3d 592, 594 (5th Cir. 2001); *accord Newton*, 209 F.3d at 452; *Crowley v. Apfel*, 197 F.3d 194, 197-98 (5th Cir. 1999); *Selders*, 914 F.2d at 618; *see also* 42 U.S.C. § 423(d)(1)(A).  " Substantial gainful activity" is defined as work activity involving significant physical or mental abilities for pay or profit.  *See Newton*, 209 F.3d at 452-53; *see also* 20 C.F.R. §§ 404.1572(a)-(b), 416.972.

A medically determinable " physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  *See Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983); *see also* 42 U.S.C. § 423(d)(3).  " [A]n individual is ' under a disability, only if his impairments are of such severity that she is not only unable to do her previous work but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .' " *Greenspan*, 38 F.3d at 236 (quoting 42 U.S.C. § 423(d)(2)(A)).  This is true regardless of whether such work exists in the immediate area in which the claimant resides, whether a specific job vacancy exists,

or whether the claimant would be hired if he applied.  *See Oldham v. Schweiker*, 660 F.2d 1078, 1083 (5th Cir. 1981); *see also* 42 U.S.C. § 423(d)(2)(A).

In the case at bar when addressing the first four steps, the ALJ determined that:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2009.

2.  The claimant has not engaged in substantial gainful activity since March 29, 2004, the alleged onset date (20 C.F.R. §§ 404.1520(b) and 404.1571 *et seq.*).

3.  The claimant has the following severe impairments:  Crohn's disease, asthma, fibromyalgia and degenerative disc disease (20 C.F.R. § 1520(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520, 404.1525 and 404.1526).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the full range of sedentary work.

6.  The vocational expert testified the claimant's past relevant work as a freight customer service was medium and semiskilled; drafter/designer was sedentary and skilled; and receptionist was sedentary and semiskilled. Based on her residual functional capacity, the vocational expert opined she could perform her past relevant work as a drafter/designer and receptionist. These jobs do not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 C.F.R. § 404.1565).

7.  The claimant has not been under a disability, as defined by the Social Security Act, from March 29, 2004 through the date of this decision (20 C.F.R. § 404.1520(f)).

(R. 20, 24).  Because the ALJ found that Wingate could perform her past relevant work, he did not proceed to step five of the sequential evaluation process.

This Court's inquiry is limited to a determination of whether there is substantial evidence in the record to support the ALJ's findings and whether the proper legal standards have been applied. *See Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 215; *Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452; *Greenspan*, 38 F.3d at 236; *see also* 42 U.S.C. §§ 405(g), 1383(c)(3). To determine whether the decision to deny Wingate's claim for disability benefits is supported by substantial evidence, the court weighs the following four factors:  (1) the objective medical facts; (2) the diagnoses and opinions from treating and examining physicians; (3) the plaintiff's subjective evidence of pain and disability, and any corroboration by family and neighbors; and (4) the plaintiff's age, educational background, and work history. *See Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (citing *DePaepe v. Richardson*, 464 F.2d 92, 94 (5th Cir. 1972)).  Any conflicts in the evidence are to be resolved by the ALJ and not the court. *See Newton*, 209 F.3d at 452; *Brown*, 192 F.3d at 496; *Martinez*, 64 F.3d at 174; *Selders*, 914 F.2d at 617.

### D.    *Issues Presented*

Wingate contends that the ALJ erred in failing to evaluate and consider her bipolar disorder.  She further argues that the Appeals Council failed to consider her submission of new and material evidence regarding her mental condition.  Finally, Wingate asserts that her RFC is not supported by substantial evidence in light of her multiple physical and mental limitations as well as the side effects of medications.  *See* Docket Entry No. 13.  The Commissioner disagrees with Wingate's contentions, maintaining that the ALJ's decision is supported by substantial evidence.  *See* Docket Entry No. 14.

E.    *Review of the ALJ's Decision*

    1.    *Objective Medical Evidence and Opinions of Physicians*

When assessing a claim for disability benefits, "[i]n the third step, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work." *Sullivan v. Zebley*, 493 U.S. 521, 525 (1990). If the claimant is not actually working and his impairments match or are equivalent to one of the listed impairments, she is presumed to be disabled and qualifies for benefits without further inquiry. *See id.* at 532; *see also* 20 C.F.R. § 416.920(d). When a claimant has multiple impairments, the Act requires the Commissioner to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B); *see Zebley*, 493 U.S. at 536 n.16; *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000). The relevant regulation similarly provides:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process. If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled.

20 C.F.R. § 404.1523; *see also Loza*, 219 F.3d at 393. The ALJ must address the degree of impairment caused by the combination of physical and mental medical problems. *See Gibson v. Heckler*, 779 F.2d 619, 623 (11th Cir. 1986) (citations omitted). The medical findings of the combined impairments are compared to the listed impairment most similar to the claimant's most severe impairment. *See Zebley*, 493 U.S. at 531.

10

The claimant has the burden to prove at step three that her impairment or combination of impairments matches or is equivalent to a listed impairment. *See id.* at 530-31; *Selders*, 914 F.2d at 619. The listings are descriptions of various physical and mental illnesses and abnormalities, most of which are categorized by the body system they affect. *See Zebley*, 493 U.S. at 529-30. Each impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results. *See id.* at 530. For a claimant to demonstrate that her disorder matches an Appendix 1 listing, it must meet *all* of the specified medical criteria. *See id.* (emphasis in original). An impairment that manifests only some of those criteria, no matter how severely, does not qualify. *See id.*

For a claimant to qualify for benefits by showing that her unlisted impairment, or combination of impairments, is equivalent to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment. *Id.* at 531 (emphasis in original) (citing 20 C.F.R. § 416.926(a)). A claimant's disability is equivalent to a listed impairment if the medical findings are at least equal in severity and duration to the listed findings. *See* 20 C.F.R. § 416.926(a). The applicable regulation further provides:

> (1)(I)  If you have an impairment that is described in the Listing of Impairments in Appendix 1 of Subpart P of this chapter, but—
>
> (A)  You do not exhibit one or more of the medical findings specified in the particular listing, or
>
> (B)  You exhibit all of the medical findings, but one or more of the findings is not as severe as specified in the listing;
>
> (ii)  We will nevertheless find that your impairment is medically equivalent to that listing if you have other medical findings related to your impairment that are at least of equal medical significance.

*Id.* Nonetheless, "[a] claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of her unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Zebley*, 493 U.S. at 531. Ultimately, the question of equivalence is an issue reserved for the Commissioner. *See Knepp v. Apfel*, 204 F.3d 78, 85 (3d Cir. 2000).

A review of the medical records submitted in connection with Wingate's administrative hearing reveal that on September 13, 2001, rheumatologist, Richard A. Rubin, M.D. ("Dr. Rubin"), diagnosed Wingate with fibromyalgia and mild degenerative disc disease. (R. 279).

On February 12, 2003, Dr. Rubin diagnosed Wingate with oral ulceration, recurrent iritis, inflammatory cervical lesions, back pain and sacroiliac limitation. Dr. Rubin recommended that additional testing be performed to test her immune system for deficiencies. (R. 260).

In March 2003, after complaining of pain in the lower, left quadrant of her abdomen, a pelvic ultrasound and CT scan confirmed a large cystic mass on her left side. (R. 185). On March 19, 2003, Wingate underwent an exploratory laparotomy,[8] which was performed by Steven Stern, M.D. ("Dr. Stern"). Dr. Stern removed a left adnexal mass on Wingate's left ovary. (R. 187, 291).

On July 2, 2003, Kenneth Alo, M.D. ("Dr. Alo"), performed needle localization on vertebra L2/3, 3/4, 4/5, 5/1, and a discography[9] of the L2/3, 3/4, 4/5, 5/1. (R. 176-177).

---

[8] "Laparotomy" is a surgical incision. *See* DORLAND'S, *supra*, at 963.

[9] "Discography" is radiography of the spine for visualization of an intervertebral disk, after injection into the disc itself of an absorbable contrast medium. *See* DORLAND'S, *supra*, at 526.

On August 22, 2003, Dr. Alo performed a percutaneous decompression ("PD")[10] of L5/S1, and a post-disc decompression discography of L5/S1.  (R. 169-170).  An examination by Dr. Alo on August 27, 2003, showed minute fragments of fibrocartilage with slight degenerative changes, lumbar radiculopathy[11], invertebral disc disease and P.D. in the L5/S1 portion of the back .  (R. 290).

At a follow-up visit on September 16, 2003, with Dr. Alo, Wingate discussed her status following her PD of her right L5/1 done in August.  According to Wingate, coughing, sneezing, bending, riding in a car, and sitting or standing for long periods all clinically aggravated her back.  Dr. Alo recommended following up her PD with spinal aquatic exercises.  (R. 167-168).

On October 21, 2003, Wingate advised Dr. Alo that lumbar pain radiated across Wingate's hips and down her legs.   Wingate also complained that numbness and tingling were present in both legs, but her right leg was worse than her left.  (R. 165-166).  Dr. Alo recommended Wingate consider another PD to avoid further muscle deterioration.  (R. 174-175).  Dr. Alo further noted that Wingate did not want to pursue surgical options given her youth.  (R. 175).

On November 11, 2003, Wingate's test results were positive for a weakened immune system (R. 253-254).  On December 23, 2003, Dr. Stern performed a laparoscopic evaluation with

---

[10] " Percutaneous decompression" or " PD", is a surgical operation for the relief of pressure in a body compartment.  *See* DORLAND'S, *supra*, at 462.

[11] " Radiculopathy" is a disease of the nerve roots.  *See* DORLAND'S, *supra*, at 1511.

drainage of a large ovarian cyst.  (R. 161).  On December 31, 2003, Dr. Alo performed a somatic

facet joint blockade and percutaneous localization[12] on Wingate.  (R. 159-160).

At a follow-up visit on February 9, 2004, Wingate showed only minimal relief in her right

hip from the radiofrequency thermocoagulation (" RFTC").  (R. 155-156).

On March 12, 2004, Wingate met David Singleton, M.D. (" Dr. Singleton"), complaining

of lumbar pain that radiated across her hips and down both legs, the right leg more than the left.

Numbness and tingling were present as well.  Dr. Singleton recommended aquatic strengthening

exercises for her lumbar and abdominal muscles and RFTC of her SI in an effort to prolong relief

from her last blockade.  (R. 157-158).  On March 31, 2004, Wingate visited podiatrist Jerry

Miles, M.D. (" Dr. Miles") on March 31, 2004, complaining of an injury to her right foot.

According to Wingate she had injured her foot a few weeks prior and it was not clear from x-rays

whether it was fractured.  (R. 335-336).  It was recommended that she stay off her injured foot

and return in two weeks for additional x-rays.  (R. 335).

On April 14, 2004, Dr. Singleton reported that Wingate showed relief of her lower back

pain (" LBP") from her RFTC; however, she complained of hip pain.  She reportedly had fallen

and right leg, which was casted and was healing well.  (R. 151-152).  On April 28, 2004, Wingate

met with Dr. Miles and her cast was removed.  (R. 332).  X-rays showed improvement in the

---

[12]  " Percutaneous localization" is an injection of radiopaque material in a radiological examination, or the removal or tissue for biopsy accomplished by needle.  *See* DORLAND'S, *supra*, at 1350.

fractured right cuboid, although pain, edema, and ecchymosis[13] were still present (R. 331-332). Wingate was provided a walking boot to limit the movement of her ankle and/or foot.

On May 21, 2004, Wingate met with Dr. Singleton, complaining of LBP radiating down her right leg.  (R. 149-150).  Dr. Singleton noted that Wingate's radiculopathy was severely interfering with her "ADLs, mobility, and sleep." (R. 150).  In a letter dated May 25, 2004, Dr. Rubin reported that he was treating Wingate for arthritis that significantly affect her activities of daily living.  (R. 244).  Additionally, Dr. Rubin reported that Wingate had suffered a stress fracture in her foot that made walking and moving about difficult.  (R. 244).  Dr. Rubin commended that Wingate's activity be limited.  (R. 244).  According to Dr. Rubin, Wingate should walk as little as possible on her foot.  Additionally,  because of her arthritis, Dr. Rubin opined that Wingate's ability to lift, push, pull, stretch, grip, etc. was limited.  (R. 244).

Wingate visited Dr. Miles on June 30, 2004, for followup care of her fractured cuboid in her right foot.  Pain, discomfort and edema were reportedly all concurrently present, although the edema was improving.  (R. 329).

On July 5, 2004, an MRI of Wingate's right ankle revealed cuboid fracture and neuritis as well as mild inflammation of her tendons, superficial swelling, and disuse osteoporosis in her right foot.  (R. 224-226).  On July 6 and 23, 2004, Dr. Alo administered lumbar intradiscal electrothermy ("IDET") to treat Wingate's lumbar disc derangement syndrome.  (R. 404-407).

---

[13] "Ecchymosis" is a small hemorrhagic spot in the skin or mucous membrane forming a nonelevated, round or irregular, blue or purplish spot.  *See* DORLAND'S, *supra*, at 563.

On August 2, 2004, Wingate visited Dr. Miles, complaining of significant pain in her foot. A cortisone shot was administered for pain.  (R. 326).  At a follow-up visit on August 5, 2004, with Dr. Singleton, Wingate complained of pain " when straining."  Dr. Singleton prescribed water therapy at home, and to continue the therapeutic management of her multilevel discopathy. Dr. Singleton recommended Wingate undergo further PD to relieve pain in her L5/S1 herniation. (R. 147-148).  Wingate visited Dr. Miles on August 16, 2004.  Mild edema of her right foot was present, along with pain in her foot and tendons.  (R. 325).  A CT scan of her right foot indicated diffuse osteoporosis that was advanced for her age and " may be secondary to disuse."  (R. 223).

On August 20, 2004, Wingate visited Northwest Diagnostic Clinic, complaining of shortness of breath and chest pain.  (R. 203).  William Crouch, M.D. (" Crouch") diagnosed Wingate with a rapid heart rate and " some dysphasia."[14]  (R. 203-204).  A CT chest exam revealed a small right pleural effusion (*i.e.*, excess fluid in the space surrounded by the lungs). (R. 207).  Wingate was hospitalized with acute pneumonia in her right lung.  (R. 199, 218). During her hospital stay, a CT scan revealed a clot in her abdominal venous system, which prompted a Doppler study of her legs.  A large clot in the posterior region of her knee and in the groin area was revealed and she was diagnosed with deep vein thrombosis (" DVT").  (R. 199). Wingate was placed on heparin and, thereafter, Coumadin (a blood thinner).  (R. 218).

In a follow-up appointment on September 16, 2004, Dr. Couch noted that Wingate' s pneumonia was " resolving" and was more of a bronchitis.  (R. 199).  Wingate indicated that she felt better, but not well.  (R. 199).  On September 21, 2004, Wingate advised Dr. Singleton that

---

[14] " Dysphasia" is an impairment of speech, consisting in lack of coordination and failure to arrange words in their proper order, due to a central lesion.  *See* DORLAND'S, *supra*, at 556.

she showed progressive right-sided weakness causing her to fall unexpectedly in addition to some loss of bladder control.  Dr. Singleton recommended an evaluation for potential surgical solutions to remedy her side weakness and loss of bladder control.  (R. 145-146).

Wingate visited Dr. Miles on October 4, 2004, for continued care of her right foot.  She continued to complain of significant pain in her right foot.  Because of Wingate' s DVT and Coumadin  therapy, it was recommended that all surgical remedies be postponed until the thrombosis had completely resolved.  (R. 324).  In a follow-up visit on October 26, 2004, Dr. Singleton opined that Wingate should consider a laminectomy, as she had exhausted her minimally invasive options.  (R. 143-144).

At a follow-up visit on December 21, 2004, Wingate continued to complain of incontinence and pain when straining.  (R. 139).  She was still wearing the boot on her right foot, and she complained that her legs were " giving out" more as well as increasing LBP and pain in her lower extremities.  A discogram showed a tear and pain at L4/5 and L5/1 in her back.  A lumbar MRI revealed a protrusion at L4/5, L5/1, and minimal bulging at L3/4.  A cervical MRI showed congenital hypoplastic[15] deformity at C1 in her back.  (R 139-140).  Wingate visited Dr. Miles on December 22, 2004, advising that she had completed therapy on her foot with little pain relief.  (R. 323).  Dr. Miles noted that her DVT had not been cleared and that he was waiting for it to clear before proceeding with any other type of treatment.  (R. 323).

On January 17, 2005, Dr. Rubin diagnosed Wingate with a deficiency that leads to predisposition to hemorrhage and/or to thrombosis—Factor V. Leiden mutation.  (R. 235).

---

[15]  " Hypoplasia" is the incomplete development or underdevelopment of an organ or tissue.  *See* DORLAND'S, *supra*, at 866.

In February 2005, Wingate visited a hematologist, Lawrence Foote, M.D. (" Dr. Foote"), for treatment of her DVT and Factor V. Leiden mutation. (R. 343). A bilateral venous leg ultrasound revealed a partial deep venous obstruction was found in the femoral and popliteal veins. (R. 343). Dr. Foote noted that Wingate's doctors were reluctant to perform foot surgery due to her hypercoagulable state. (R. 218). Dr. Foote opined that Wingate may have a clot in her abdomen and leg. (R. 219). Based on the fact that Wingate " has a insignificant clotting event, is overweight, is taking progesterone, and does have autoimmune disease as well as previous clot, and the Factor V Leiden mutation," Dr. Foote recommended that she remain on a low dose of Coumadin for a long period of time. (R. 219-220).

On February 16, 2005, Wingate visited a pain management specialist, Donald L. Kramer, M.D. (" Dr. Kramer"), complaining of neck, back and hip pain. (R. 371-373). Dr. Kramer's impression was cervical and lumbar chronic pain and strain. (R. 373). Manipulation under anesthesia was recommended to her improve range of motion in her neck, hips and lower back (R. 373). In preparation for surgery on Wingate's right foot, on March 1, 2005, Dr. Foote notified Dr. Miles of Wingate's blood clot in her leg and abdomen. Dr. Foote recommend that Wingate stay on anticoagulants for the rest of her life because of her Factor V Leiden affliction. (R. 215). A repeat CT scan showed no evidence of a clot in her abdomen, but a Doppler of her legs shows scarring of the vein. (R. 215). Medication adjustments were recommended in preparation for Wingate's foot surgery. 9R. 217).

On March 9, 2005, Dr. Rubin noted that Wingate's fibromyalgia and inflammatory bowel disease were both associated with her arthritis. (R. 231). Although Dr. Rubin speculated that Wingate's prior bout of pneumonia may have been caused after a dose of medication (*i.e.*,

18

Remicade), Dr. Rubin opined that Wingate had been more achy, fatigued, and worsening since the discontinuation of the medication.  (R. 231).  Thus, Dr. Rubin recommended that Wingate resume the medication infusion.  (R. 231).

On March 14, 2005, Wingate was admitted to the hospital for manipulation under anesthesia.  (R. 398-403).  R. Alan Moore, M.D. (" Dr. Moore"), Michiel Rorick, M.D. (" Dr. Rorick"), and Kenneth Efird, M.D. (" Dr. Efird") assisted with the surgery.  (R. 398).  Her spine, hip, shoulder and pelvis were manipulated and stretched to add range of motion in an attempt to relieve Wingate' s pain (R. 398-403). Post-surgery, Wingate' s prognosis was considered to be good.  (R. 403).

An MRI on March 22, 2005, showed between mild and advanced loss of disc signal in the L ½ 2/3, 3/4, 4/5 lumbar spine and L5-S1; canal stenosis was present as well.  (R. 282-283).  On March 31, 2005, Wingate visited Dr. Miles for a re-evaluation of her right foot pain.  (R. 320). Because conservative treatments (e.g., anti-inflammatories, cortisone injections, physical therapy, cast, and walking boot) had failed, surgery was recommended, with care shown to her DVT and hypercoagulopathy.  (R. 320-322).

Wingate visited Dr. Kramer on April 7, 2005, complaining of right knee and foot pain. (R. 370).  She wore a walking boot on her right foot.  Dr. Kramer noted generalized tenderness without effusion of her right knee.  (R. 370).  Dr. Kramer opined that she may have a sprained knee, and recommended that she return two weeks after her right foot surgery.  (R. 370).

On April 14, 2005, Dr. Miles performed a sinus tarsectomy and resection of fibrous coalition, both on the right foot.  Instructions were given to wear a Cam Walker at all times until the followup visit (R. 316-317).  Wingate visited Dr. Miles on April 28, 2005, for follow-up care

19

of her right foot.  (R. 314).  Ecchymosis, edema and erythema at the surgical site were present.

(R. 314). Wingate fell on her way to the appointment today,  which explained some of the

excessive bruising.

Wingate visited Dr. Moore on May 3, 2005.  She was awaiting cervical median branch

blocks, but had recently fallen and fractured her hip.  She was diagnosed with a cervical strain,

spine stenosis secondary to a protruding disc and internal derangement of the right hip.  Dr.

Moore recommended that cervical median branch blocks and radiofrequency neurectomies should

begin after Wingate's foot healed.  (R. 369).

On June 3, 2005, Wingate visited Dr. Moore, complaining of right hip pain and lower back

pain.  (R. 567).  She was awaiting her cervical median branch blocks, but fell and fractured her

hip so the procedure was postponed.  Dr. Moore recommended an injection in Wingate's hip

while the fractured foot heals and awaiting the cervical median branch blocks and radiofrequency

neurectomies should begin (R. 567).  Wingate visited Dr. Moore on June 6, 2005, and prepared

for her cervical median branch blocks.  (R. 566).

On July 5, 2005, due to Wingate's on-going cervical strain,  Dr. Moore performed a

cervical median branch block on C4-5, 5-6, 6-7, and C7-T1.  (R. 564).  On July 7, 2005, Wingate

visited Dr. Miles for follow-up care of her foot.  Wingate was ten (10) weeks post-foot injury and

still using the walking boot.  X-rays showed good bone consolidation in her right foot.  Edema,

pain, and osteopenia of the cuboid in the right foot were still present, as well as disuse atrophy.

(R. 330).

Wingate visited Dr. Moore on August 1, 2005, for a follow-up from her cervical median

branch block.  Due to  continued pain, a radiofrequency neurectomy was scheduled.  (R. 563).

20

Her range of motion was limited when bending and rotating.  (R. 367).  On August 16, and 23, 2005, Dr. Moore performed an RFTC cervical.  (R. 374, 559).  Dr. Moore performed a RFTC cervical surgery on Wingate on August 23, 2005.  Wingate visited Dr. Moore on August 31, 2005, for follow-up care post- median branch blocks.  Two (2) trigger point injections were given into the tender areas this day, but the surgery was a success and relieved much of pain.  A follow-up appointment was scheduled in one month (R. 558).

On October 19, 2006, Wingate visited Dr. Moore, for follow-up care from her radiofrequency neurectomy and for medication refills.  Pain was still present in the right hip, cervical and lumbar spine.  (R. 557).  At the request of Dr. Moore, an MRI of the lumbar spine was performed on Wingate on October 29, 2005.  Annular tearing was found in the L1-L2, and disc herniation was found at the T7-T8 and T8-T9.  Both herniations contacted the spinal cord which was a point of concern.  (R. 554-556).

On November 1, 2006, Wingate visited Dr. Miles, complaining of a contusion to her right foot.  She was placed in orthotics.  Dr. Moore performed a right hip corticosteroid injection on Wingate on November 1, 2005,  to combat her pain and arthritis.  (R. 551-552).  Wingate visited Dr. Miles on November 11, 2005, for orthotic casting for her foot.  (R. 479).  Wingate visited Dr. Moore again on November 21, 2005; complaining that she received very little relief from her hip injection.  (R. 550).  She claimed she had pain in multiple locations.  (R. 550).  Additionally, she had fallen and injured ligaments in her right foot.  At that time, she was in a post-operative boot.  (R. 550).       On December 6, 2005, due to lumbosacral strain, Dr. Moore performed an arthrography of Wingate's SI joint with injection and somatic blockade.  (R. 548-549).  Wingate visited Dr. Miles on December 19, 2005, for dispensing of her orthotic footwear.   (R. 481).

21

Wingate visited Dr. Miles on January 6, 2006, complaining that her orthotics made her feet hurt worse.  (R. 478).  She was continuing to use a walking boot for ambulation.  It was recommended that she have additional surgery on her foot.  (R. 478).  Wingate visited Dr. Moore on January 16, 2006, complaining that she did not get significant pain relief from her lumbar median branch block.  (R. 546).  Additionally, Wingate complained she was continuing to have significant problems with her non-healing foot fracture.  (R. 546).  Dr. Moore noted that her regular orthopedic surgeon was reluctant to address the problem in light of her clotting disorder. (R. 546).

Wingate visited Dr. Miles on February 13, 2006, complaining of pain in her right foot. (R. 473).   Dr. Miles noted that a MRI revealed edema in the proximal calcaneous and distal cuboid of the right foot, consistent with arthritis in that joint.  (R. 473-475).  On that same day, Wingate visited Dr. Moore, for a follow-up appointment and medication refills.   (R. 543). Wingate reported that pain was still present in her spine, back and neck.  (R. 543).  Dr. Moore recommended thoracic epidural steroid injections.  (R. 543).  According to Wingate, the pain was so severe that she was unable to work, drive, walk or even take the bus because of an inability to board it; hence, Dr. Moore supported her application to the MetroLift Program.  (R. 543-545). On February 28, 2006, Dr. Moore performed a transforaminal epidural thoracic block on Wingate's left T6-7 and 7-8 as well as paravertebral intramyofascial injections in her back.  (R. 541-542).

Wingate visited Dr. Moore on March 13, 2006, reporting excellent results from the steroid injection on her left side; however, her right side continued to have pain.  (R. 539).  It was recommended that she return in a month to consider repeating the steroid procedure.  (R. 539).

Wingate visited Cristina Payan, M.D. (" Dr. Payan"), on March 13, 2006, for a pelvic sonogram.

No abnormalities were found.  (R. 426-427).  On March 27, 2006, Wingate visited Dr. Miles,

complaining of right foot pain.  She had been cleared for additional foot surgery.  (R. 472).

On April 3, 2006, Rajeshwar P. Abrol, M.D. (" Dr. Abrol"), performed an

esophagogastroduodenoscopy and colonoscopy on Wingate.  (R. 422-423).  Internal hemorrhoids

were located and removed.  (R. 422-423).  On April 6, 2006, Dr. Miles performed surgery on

Wingate' s right foot, including an implantable bone stimulator, posterior splint, and PT nerve

block.  (R. 464-470).

Wingate visited Dr. Moore on May 8, 2006, for a follow-up appointment and medication

refills.  (R. 536).  Wingate complained of a sharp increase in pain in her cervical area as well as

mid-thoracic area.  (R. 536).  It was recommended that a radiofrequency neurectomy be performed

again since it had not been done in almost a year.  (R. 536-538).  Wingate visited Dr. Miles on

May 24, 2006, for a follow-up visit for her right foot.  (R. 459).  Wingate reportedly fell out of

the wheel chair on the way to the office, and was having some pain and discomfort.  (R. 459).

Dr. Miles reported that x-rays showed good positioning of the fusion site of the bone stimulator,

calcaneal cuboid fusion site and subtalar fusion site.  (R. 459).  Wingate was switched from a

splint to a walking boot, but instructed to remain non-weight bearing.  (R. 459).

On June 19, 2006, during a follow-up visit with Dr. Miles, Wingate was instructed to

begin weight bearing with her walking boot.  (R. 457).   On June 26, 2006, Wingate visited

Mikhail Fukshansky, M.D. (" Dr. Fukshansky"), complaining of thoracic pain.  (R. 534).  At that

time, it was noted that Wingate was wearing a cast and in a wheelchair.  (R. 534).  She was

scheduled for a cervical median branch radiofrequency ablation in her back; however, Dr.

23

Fukshansky noted that this procedure was postponed until she fully recovered from her foot surgery.  (R. 534-535).

Wingate visited Dr. Miles on July 17, 2006, for follow-up care of her right foot.  (R. 454). She complained of pain with palpation, but her foot remained clinically stable.  (R. 454).  She was instructed to discontinue using the walker, begin full weight bearing in the walking boot, and to start physical therapy.  (R. 454).

On August 2, 2006, Wingate visited Dr. Miles, complaining of pain at the subtalar joint, calcaneal  cuboid, and at the dorsal ankle joint.  (R. 452).  She also complained of having pain where the bone stimulator battery attached at the back of her right calf.  (R. 452).  She was out of the walking boot, wearing tennis shoes, and using crutches.  Dr. Miles wrote Wingate a prescription for a quad cane.  (R. 452).  On August 17, 2006, Dr. Miles surgically removed the bone stimulator from Wingate' s right leg.  (R. 447-451).

Wingate visited Dr. Moore on August 21, 2006, complaining of severe pain on cervical hyperextension and lateral side bending.  Dr. Moore noted weakness in grip persisting congruent with right C7 ad left C6 and C7 deficits.  (R. 531-532).  Dr. Moore noted that Wingate was awaiting her radiofrequency neurectomies.  (R. 531-532).

Wingate visited Dr. Miles on August 30, 2006, for post-surgery care on her foot.  (R. 445). Her sutures were removed, and pain and discomfort were noted.  Dr. Miles instructed her to begin therapy.  (R. 445).

Wingate visited Dr. Moore on September 13, 2006, for post-operative care from her radiofrequency neurectomy on the left side.  There were left C-7 and right C-6 sensory deficits

that were relatively new. (R. 529). A follow-up appointment was scheduled so that the neurectomy on the right portion could be performed. (R. 529-530).

Wingate visited Dr. Miles on September 14, 2006, for follow-up care of her right foot. She reported her pain and discomfort as better, but was instructed to continue her physical therapy. (R. 443).

On September 15, 2006, Dr. Moore performed a radiofrequency facet neurectomy with destruction of nerves on Wingate's right C3-4, 4-5, 5-6, and 6-7, and paravertebral intramyofascial injections were given, as well. (R. 527-528). Wingate visited Dr. Moore on October 9, 2006, for a followup from her right cervical radiofrequency ablation. Wingate was considering a trial spinal cord stimulator implant at that time for pain management. (R. 525-526).

Wingate visited Dr. Miles on October 9, 2006, for continued care of pain in her right foot. She complained of pain upon palpation at the surgical site. (R. 441).

On October 26, 2006, Wingate had at CT scan of her abdomen and pelvis, which was unremarkable aside from a calcified injection granulomata within the bilateral gluteal soft tissues. (R. 417).

Wingate visited Dr. Moore on November 6, 2006, complaining of increased pain in her thoracic spine. (R. 524). Dr. Moore recommended that she proceed with the implantation of the trial spinal cord stimulator, which required psychological screening prior to the implant. (R. 524).

Wingate visited Dr. Miles on November 9, 2006, because of pain inflicted on the right foot by an ingrown hallux nail. Pain and discomfort were noted, and permanent removal of the hallux

nail was scheduled.  (R. 438).  Wingate visited Dr. Miles on November 13, 2006, for permanent

correction of her toenail.  Upon inspection the toenail was growing into the skin on both sides.

A local anesthesia was administered, and minor surgery was performed to remedy the in-grown

toenail on her right foot.  (R. 437).  On November 25, 2006, Dr. Miles re-casted Wingate for a

walking boot with more cushion.  She continued to report pain at the surgical site.  (R. 440).  On

November 27, 2006, during a follow-up examination with Dr. Miles, Wingate reported pain and

difficulty walking.  (R. 435).

On November 30, 2006, Wingate visited clinical psychologist Glenn Bricken, Psy.D.

("Dr. Bricken") for an evaluation of her psychological state to determine if she would be a good

candidate for a trial spinal cord stimulator implant.  (R. 520-522).  Dr. Bricken noted that Wingate

had an MRI that revealed disc herniation at T6-7 and T7-8.  He further noted that she undergone

two cervical radiofrequency ablations, but continued to suffer from pain in her neck, mid and low

back with numbness in her hands, legs and feet.  It was reported that she was suffering from

insomnia, depression, bipolar disorder, sadness, loss of energy, frustration secondary to her injury

and physical deterioration.  Her global assessment of functioning was rated at 65.[16]  Dr. Bricken

diagnosed Wingate with an adjustment disorder with mixed anxiety and depressed mood.  (R.

---

[16] A GAF score represents a clinician's judgment of an individual's overall level of functioning.  *See*
AMERICAN PSYCHIATRIC ASSOCIATION: DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS
("DSM-IV-TR") 32 (4th ed. 2000).  The reporting of overall functioning is done by using the GAF Scale,
which is divided into ten ranges of functioning—*e.g.*, 90 (absent or minimal symptoms) to 1 (persistent
danger of severely hurting self or others, or unable to care for himself).  The GAF rating is within a particular
decile if either the symptom severity or the level of functioning falls within the range. Lower GAF scores
signify more serious symptoms.  A GAF rating of 65 indicates a "some mild symptoms" (*e.g.*, depressed
mood and mild insomnia) or some difficulty in social, occupational, or school functioning, but generally
functioning pretty well, has some meaningful interpersonal relationships.  *See id* at 34.

521).  Dr. Bricken found Wingate to be psychologically stable enough to understand the risks and benefits concerning implantation of a spinal cord stimulator.   (R. 520-522).

On December 4, 2006, Wingate visited Dr. Moore, complaining of thoracic pain as well as tingling and numbness in her arms and legs.  (R. 523).  On December 5, 2006, a CT bone density scan revealed osteoporosis in her right hip and normal bone density of the left hip and lumbar spine.  (R. 415).

Wingate visited Dr. Moore on January 3, 2007, following her trial of the spinal cord stimulator.  Dr. Moore noted that she had excellent response to the trial with greater than 80% pain relief.  (R. 515).  Dr. Moore noted that Wingate was " anxious to proceed with the permanent implant."  (R. 515).

Wingate visited Dr. Miles on January 29, 2007, for continued pain in her right foot.  Cortisone injections were given for the pain.  (R. 431).  Wingate visited Dr. Moore on February 12, 2007, for a post-operation visit from her permanent spinal cord stimulator implant.  Her dressings were changed, and the surgery seemed to be successful.  (R. 509-512).

Wingate visited Dr. Miles on February 12, 2007, complaining that her third toe on her right foot was clinically painful.  (R. 430).  On February 19, 2007, a CT bone density scan revealed normal bone mineral deposits of the right and left hip and borderline osteopenia changes involving the lumbar spine.  (R. 413).

Wingate visited Dr. Moore on February 21, 2007, for post-operation care from her permanent spinal cord stimulator surgery implant.  The surgery seemed to have been successful.  The sutures were removed, and a follow-up visit was scheduled for one week.  (R. 504-508).

27

Wingate visited Dr. Moore on March 5, 2007, for wound drainage and potential removal of the spinal cord stimulator because wires were protruding from the wound.  Wingate was sent to University General Hospital for immediate removal of the spinal cord stimulator and treatment for wound infection.  (R. 500-503).  Wingate visited Dr. Moore on March 12, 2007, after having her spinal cord stimulator removed.  Her sutures were satisfactory, and she was scheduled for a follow-up visit in two weeks.  (R. 497-499).  Wingate visited Dr. Moore on March 27, 2007, for suture and staple removal from her spinal cord stimulator removal surgery.  She was scheduled for a follow-up appointment in one month.  (R. 493-496).  Wingate visited Dr. Moore on April 16, 2007, complaining of cervical pain, and to determine if and when the spinal cord stimulator could be placed.  (R. 487-490).  Dr. Moore reported that placement of spinal cord stimulator would be considered after infectious disease clearance.  (R. 490).

Wingate visited Dr. Miles on May 7, 2007, complaining of pain in her right foot.  (R. 429). Dr. Miles reported that Wingate had neuritis of the cutaneous nerve from the bone stimulator in her right foot.  Anesthesia was administered for the pain.  (R. 429).  Dr. Miles recommended a sural nerve neurectomy be scheduled.  (R. 429).  Wingate visited Dr. Moore on May 29, 2007, complaining of pain in her right hip, right leg, and right neck and back.  (R. 483-486).

On June 4, 2007, Wingate met with psychiatrist Lawrence Ginsberg, M.D. ("Dr. Ginsberg").[17] *See* Docket Entry No. 13, at Exh. A.  At that time, Dr. Ginsberg recommended psychiatric hospitalization.  *See id*.

---

[17] Wingate's prior counsel allegedly tendered Dr. Ginsberg's treatment records to the ALJ prior to his decision being rendered and also attached the records to Wingate's Request to Review submitted to the Appeals Council (R. 13-14); however, the transcript does not include these records.

" [O]rdinarily the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability." *Greenspan*, 38 F.3d at 237; *accord Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985). The opinion of a specialist generally is accorded greater weight *than* that of a non-specialist. *See Newton*, 209 F.3d at 455; *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994), *overruled on other grounds by Sims v. Apfel*, 530 U.S. 103, 108 (2000). Medical opinions are given deference, however, only if those opinions are shown to be more than conclusory and supported by clinical and laboratory findings. *See Scott*, 770 F.2d at 485. Moreover, a treating physician's opinions are far from conclusive and may be assigned little or no weight when good cause is shown. *See Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Greenspan*, 38 F.3d at 237.

Good cause may permit an ALJ to discount the weight of a treating physician's opinion in favor of other experts when the treating physician's evidence is conclusory, unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence. *See Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 456 (citing *Brown*, 192 F.3d at 500; *Greenspan*, 38 F.3d at 237; *Paul*, 29 F.3d at 211). It is well settled that even though the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, the ALJ has sole responsibility for determining a claimant's disability status. *See Paul*, 29 F.3d at 211; *accord Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 455.

### a.   *ALJ's Failure to Consider Mental Impairment*

In the case at bar, the ALJ's decision is not supported by substantial evidence because he failed to consider Wingate's alleged mental limitations. As set forth above, the record contained

numerous references to Wingate' s alleged mental illness as well as medication for treating the same.  (R. 124, 129, 484, 487, 493, 497, 500, 504, 509, 517, 519, 521, 571).  Wingate' s calendar, which was tendered into evidence, also noted numerous psychiatric appointments with Dr. Ginsberg.  (R. 606-609, 611).  At the hearing, when the medical expert noted that Wingate was taking Lamectil and Cymbalta for bipolar disorder and inquired about obtaining Dr. Ginsberg' s treatment notes, Wingate' s counsel advised that the records were expected to arrive " soon."  (R. 651).  Although it was patently obvious that Wingate was being treated for a mental illness, the ALJ neither mentioned bipolar disorder or depression nor made any determination regarding the severity of her mental illness in his decision.  It is well settled that the ALJ cannot simply pick and choose only the evidence that supports his position.  *See Loza*, 219 F.3d at 393-94.  Indeed, the law in the Fifth Circuit requires the ALJ to explain his reasons for rejecting evidence favorable to Wingate.  *See Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994).  Because the ALJ failed consider all of Wingate' s alleged impairments, the ALJ' s decision is not supported by substantial evidence.

   b.      ***Appeals Council' s Failure to Consider Psychiatric Records and Disability Letters from Treating Physicians***

   Wingate maintains that her prior counsel submitted records to the Appeals Council that were not considered and were not included as part of the transcript.  According to Wingate, via correspondence dated July 25, 2007, her former counsel submitted to the Appeals Council the following: (1) psychiatric records from Dr. Ginsberg; (2) disability questionnaire completed by Dr. Rubin; and (3) disability letter dated July 9, 2007, completed by Dr. Miles.  (R. 13-14).  Although the correspondence references to the documents as being attached, they are not included in the

administrative record.  The Commissioner fails to explain why these documents were omitted. Moreover, neither the documents nor the attorney's correspondence appear to have been considered by the Appeals Council, as they are not referenced in the order of the Appeals Council declining to review the ALJ's decision.  (R. 5-7).  It is impossible for the Court to ascertain the full relevance and/or materiality of the additional documents without a complete administrative record.  Because it appears that the Appeals Council failed to properly consider Wingate's additional evidence, this case must be remanded for further consideration of the same.

### 2. *Subjective Complaints*

The law requires the ALJ to make affirmative findings regarding a claimant's subjective complaints.  *See Falco*, 27 F.3d at 163 (citing *Scharlow v. Schweiker*, 655 F.2d 645, 648-49 (5th Cir. 1981)).  When a plaintiff alleges disability resulting from pain, he must establish a medically determinable impairment that is capable of producing disabling pain.  *See Ripley v. Chater*, 67 F.3d 552, 556 (5th Cir. 1995) (citing 20 C.F.R. § 404.1529).  Once a medical impairment is established, the subjective complaints of pain must be considered along with the medical evidence in determining the individual's work capacity.  *See id.*

It is well settled that an ALJ's credibility findings on a claimant's subjective complaints are entitled to deference.  *See Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Scott v. Shalala*, 30 F.3d 33, 35 n.2 (5th Cir. 1994); *Falco*, 27 F.3d at 164; *Wren*, 925 F.2d at 128. The Fifth Circuit recognizes that "the ALJ is best positioned" to make these determinations because of the opportunity to observe the claimant first-hand.  *See Falco*, 27 F.3d at 164 & n.18. Moreover, "[t]he Act, regulations and case law mandate that the Secretary require that subjective complaints be corroborated, at least in part, by objective medical findings."  *Harrell v. Bowen*,

31

862 F.2d 471, 481 (5th Cir. 1988) (citing 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1529; *Owens v. Heckler*, 770 F.2d 1276, 1281-82 (5th Cir. 1985)); *accord Chambliss*, 269 F.3d at 522 (citing *Houston v. Sullivan*, 895 F.2d 1012, 1016 (5th Cir. 1989)); *Hampton v. Bowen*, 785 F.2d 1308, 1309 (5th Cir. 1986).

As a matter of law, the mere fact that working may cause a claimant pain or discomfort does not mandate a finding of disability. *See Hames*, 707 F.2d at 166; *Epps v. Harris*, 624 F.2d 1267, 1274 (5th Cir. 1980); *accord Brown v. Bowen*, 794 F.2d 703, 707 (D.C. Cir. 1986). Additionally, the mere existence of pain does not automatically bring a finding of disability. *Harper v. Sullivan*, 887 F.2d 92, 96 (5th Cir. 1989); *Owens*, 770 F.2d at 1281. It must be determined whether substantial evidence indicates an applicant can work despite being in pain or discomfort. *See Chambliss*, 269 F.3d at 522; *Johnson v. Heckler*, 767 F.2d 180, 182 (5th Cir. 1985).

For pain to rise to the level of disabling, that pain must be " constant, unremitting, and wholly unresponsive to therapeutic treatment." *Chambliss*, 269 F.3d at 522; *Falco*, 27 F.3d at 163; *Wren*, 925 F.2d at 128. The decision arising from the ALJ' s discretion to determine whether pain is disabling is entitled to considerable deference. *See Chambliss*, 269 F.3d at 522; *Wren*, 925 F.2d at 128; *James*, 793 F.2d at 706. However, an ALJ may discount subjective complaints of pain as inconsistent with other evidence in the record. *See Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003) (citing *Wren*, 925 F.2d at 128 (citation omitted)).

Here, the medical records and Wingate' s testimony at the administrative hearing set forth her complaints of pain. (R. 53, 86, 135, 139-158, 165-168, 174-175, 182-185, 199, 209-211, 230-231, 241-242, 245-246, 249-250, 253-254, 258-260, 267, 308-315, 320-327, 329-334, 336,

367-373, 429-446, 452, 456-457, 461, 463-464, 470, 479-482, 484-512, 515-519, 523-526, 529-540, 543-544, 546-547, 550, 557-558, 563, 566-567, 572-575, 580-581, 588-589 639-651). Although the medical records are saturated with progress notes pertaining to pain management techniques (both conservative and surgical), the ALJ inexplicably found that Wingate's subjective allegations were not supported by the medical record and her complaints were exaggerated. (R. 23-24). Taking into consideration the overwhelming number of medical records corroborating Wingate's assertions regarding pain, the ALJ's finding that Wingate's symptoms are "mild to moderate at most" is not supported by substantial evidence. (R. 24).

Moreover, ALJ erred by placing too much emphasis on his own observations of Wingate during the administrative hearing and improperly subjected Wingate to "sit and squirm" jurisprudence.[18] *See Muncy v. Apfel*, 247 F.3d 728, 736 (8th Cir. 2001); *Flores v. Massanari*, 19 Fed. Appx. 393, 404 (7th Cir. 2001); *Puckett v. Barnhart*, No. 1:01-cv-584, 2003 WL 1831066, at *9 (E.D. Tex. Feb. 5, 2003). While a claimant's demeanor may not be relied upon exclusively to deny benefits, an ALJ may cite to a claimant's demeanor at the hearing if it is clear that the ALJ considered other factors to deny disability benefits. *See Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987); *see also Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990); *Burnside v. Bowen*, 845 F.2d 587, 592 (5th Cir. 1988), *abrogated on other grounds by Sullivan v. Zebley*, 493 U.S. 521 (1990). In the case at bar, the ALJ did not carefully review the medical evidence before reaching his decision, he improperly relied on a "sit and squirm doctrine" to discount Wingate's credibility.

---

[18] "During the course of the hearing, the Administrative Law Judge had an opportunity to observe the claimant. The claimant sat for almost two hours without complaining of discomfort, which is inconsistent with her testimony that she is unable to sit for more than 30 minutes." (R. 24).

To the extent the ALJ failed recognize Wingate's alleged mental illness, even Dr. Goldstein testified at the hearing that " . . . I know pain is a subjective complaint and if one has like a Bi-Polar Disorder and is severely depressed that can influence significantly the degree of pain and the reaction to the pain that one might have." (R. 674).  Moreover, in an apparent acknowledgment of Wingate's mental illness, Dr. Goldstein further opined at the hearing that he was "not sure how much insight he [Dr. Miles] has into the psychiatric part of her problems. And how much that is causing many of her complaints." (R. 676).  Despite this testimony as well as the numerous references in the administrative record, the ALJ failed to consider Wingate's alleged mental illness when making his credibility determinations as to her subjective complaints. As such, the ALJ findings as to Wingate's credibility are not supported by substantial evidence.

### 3.    *Residual Functional Capacity*

Under the Act, a person is considered disabled:

> . . . only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work. . . .

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).  The Commissioner bears the burden of proving that a claimant's functional capacity, age, education, and work experience allow her to perform work in the national economy.  *See Brown v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *see also Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 216; *Myers*, 238 F.3d at 619; *Greenspan*, 38 F.3d at 236.  If the Commissioner fulfills this burden by pointing out potential alternative

employment, the claimant, in order to prevail, must prove that she cannot perform the alternate work suggested.  *See Masterson*, 309 F.3d at 272; *Boyd*, 239 F.3d at 705; *Shave*, 238 F.3d at 594; *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).

To determine whether a claimant can return to a former job, the regulations require the ALJ " to evaluate the claimant' s 'residual functional capacity.' "  *See Carter v. Heckler*, 712 F.2d 137, 140 (5th Cir. 1983); *see also* 20 C.F.R. § 416.961.  This term of art merely designates the ability to work despite physical or mental impairments.  *See Carter*, 712 F.2d at 140; *see also* 20 C.F.R. § 416.945.  RFC combines a medical assessment with the descriptions by physicians, the claimant or others of any limitations on the claimant' s ability to work.  *See id.*  When a claimant' s RFC is not sufficient to permit her to continue her former work, then her age, education, and work experience must be considered in evaluating whether she is capable of performing any other work.  *See id.* (citing 20 C.F.R. § 404.1561).  The testimony of a vocational expert is valuable in this regard, as " [he] is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed."  *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986); *accord Carey*, 230 F.3d at 145; *see also Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir. 1995).

In evaluating RFC, the Fifth Circuit has looked to SSA rulings (" SSR").  *See Myers*, 238 F.3d at 620.  The Social Security Administration' s rulings are not binding on this court, but they may be consulted when the statute at issue provides little guidance.  *See id.*  In *Myers*, the Fifth Circuit relied on SSRs addressing RFC and exertional capacity.  *See id.*  In that case, the court explained:

> First, SSR 96-8p provides that a residual functional capacity (RFC) is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule. The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities. However, without the initial function-by-function assessment of the individual's physical and mental capacities, it may not be possible to determine whether the individual is able to do past relevant work. . . . RFC involves both exertional and non-exertional factors. Exertional capacity involves seven strength demands: sitting, standing, walking, lifting, carrying, pushing, and pulling. Each function must be considered separately. In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis. . . . The RFC assessment must include a resolution of any inconsistencies in the evidence.

*Id.* (internal citations omitted); *see* 61 Fed. Reg. 34474-01 (July 2, 1996). The court further commented:

> Second, SSR 96-9p also provides that initially, the RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to perform work-related activities. . . . The impact of an RFC for less than a full range of sedentary work is especially critical for individuals who have not yet attained age 50. Since age, education, and work experience are not usually significant factors in limiting the ability of individuals under age 50 to make an adjustment to other work, the conclusion whether such individuals who are limited to less than the full range of sedentary work are disabled will depend primarily on the nature and extent of their functional limitations or restrictions.

*Id.* (internal citations omitted); *see* 61 Fed. Reg. 34478 (July 2, 1996). The court also noted that SSR 96-9p defines "exertional capacity" as the aforementioned seven strength demands and requires that the individual's capacity to do them on a regular continuing basis be stated. *See id.* To determine that an claimant can do a given type of work, the ALJ must find that the claimant can meet the job's exertional requirements on a sustained basis. *See Carter*, 712 F.2d at 142 (citing *Dubose v. Matthews*, 545 F.2d 975, 977-78 (5th Cir. 1977)).

36

Here, the ALJ's RFC is not supported by substantial evidence because he failed to consider Wingate's alleged mental limitations in formulating her RFC.  As set forth above, the record contained numerous references to Wingate's alleged mental illness as well as medication (*e.g.*, Cymbalta) for treating the same.  (R. 124, 129, 484, 487, 493, 497, 500, 504, 509, 517, 519, 521, 571).  Nevertheless, the ALJ failed to incorporate a hypothetical question to the vocational expert that included any alleged mental limitations.

Moreover, the ALJ fails to discuss Wingate's ability to maintain employment given the frequency of her medical appointments.  Indeed, as evidenced by the voluminous medical records and condensed by Wingate's own calendar, in the first six months of 2007, Wingate had at least 58 medical appointments on 35 separate days and four days of hospitalization.   Indeed, the vocational expert testified at the administrative hearing that no more than two absences from work per month would be tolerated; however, based on the frequency of visits in early-2007, Wingate would miss significantly more days per month.  (R. 20, 685-687).  The ALJ's decision fails to account for the high frequency of her visits or the vocational expert's testimony in this regard.

Accordingly, the case must be remanded for the ALJ to consider Wingate's alleged mental limitations when determining her RFC, to articulate each of her functional limitations in a complete hypothetical question to a vocational expert, to ascertain whether any work exists that Wingate is capable of performing.

### F.      *Failure to Consider Medication Side Effects*

Wingate's medication list contains eighteen different medication prescribed by her treating physicians.  (R. 129).  Wingate testified at the administrative hearing that at least four medications

affected her mental acuity and made her sleepy and drowsy.  (R. 645).  In his decision, the ALJ acknowledge Wingate's testimony regarding side effects from medication, but did not mention the impact such side effects may have on her RFC.

SSR 96-7p specifically requires consideration of the "type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms" in assessing the credibility of an individual's statements.  *See* 20 C.F.R. § 416.929(c)(3)(iv). Pursuant to SSR 96-8p, the RFC assessment "must be based on all of the relevant evidence in the case record," including "the effects of treatment" and the "limitations or restrictions imposed by the mechanics of treatment; *e.g.*, frequency of treatment, duration, disruption to routine, side effects of medication."

Because Wingate is required to take several medications, including anti-depressants/anti-anxiety as well as pain medications, the ALJ should have taken into consideration possible medication side-effects and any impact such medication might have on Wingate's RFC.  *See Loza*, 219 F.3d at 397 (history of claimant's extensive medical treatment with anti-psychotic and other mood altering medications indicated presence of disabling mental illness and possibility of medication side effects that could render claimant disabled or at least contribute to disability).  The ALJ erred by failing to make such an evaluation.  Upon remand, the effect of medication side-effects should be considered in evaluating Wingate's credibility and RFC.

**III.**   *Conclusion*

Accordingly, it is therefore

**ORDERED** that Wingate's Motion for Summary Judgment (Docket Entry No. 13) is **GRANTED**.  It is further

**ORDERED** that the Commissioner's decision denying disability benefits is **REVERSED** and **REMANDED,** pursuant to " sentence four" of the Social Security Act, 42 U.S.C. § 405(g), to the Commissioner for a new hearing to properly consider the severity of Wingate's alleged mental impairments, to incorporate Wingate's alleged mental functional limitations in a hypothetical question to the VE, to develop clear testimony from a VE regarding jobs, if any, Wingate is capable of performing considering all of her limitations, and to consider Wingate's medications in her RFC and credibility assessments.

**SIGNED** at Houston, Texas, on this the 21st day of September, 2009.

Calvin Botley
United States Magistrate Judge